George F. BOYD, Plaintiff-Appellant,

v.

A. E. MARGOLIN and James Gary Knaus, Co-Executors of the Estate of Ezra D. Knaus, Deceased, Defendants-Appellants,

A. E. Margolin and James Gary Knaus, Co-Executors of the Estate of Ezra D. Knaus, Deceased, Defendants-Respondents.

No. 52505.

Supreme Court of Missouri,
Division No. 2.

Dec. 11, 1967.

Albert Thomson, Kansas City, for plaintiff-appellant, George F. Boyd.

Linde, Thomson, VanDyke, Fairchild & Langworthy, Kansas City, of counsel.

Charles W. Medley, Robert A. Goodman, Margolin & Kirwan, Kansas City, for defendant-appellant.

PRITCHARD, Commissioner.

Plaintiff recovered judgment for $10,000 for a broker's fee in the sale of the Knaus Truck Lines, Inc. He contends that he was entitled to a directed verdict of $36,000 upon his contract made by Ezra D. Knaus (deceased since the time of trial), being 5% commission upon the sale of the Knaus Company to Consolidated Freightways, Inc., for 60,000 of its shares, said to be of a value of $720,000, the allegations for which were embodied in Count I of the petition. Defendants counter plaintiff's contentions and say that he has failed to prove that he in entitled to $36,000 on the alleged express contract as a matter of law, and further by cross-appeal that he is not entitled to the $10,000 verdict and judgment on the theory of an implied contract (Count II of the petition).

Plaintiff, Boyd, now of Carthage, Missouri, has been in the trucking business since the early 1930's. He started with one truck, built the company up for 20-odd years, then sold it to Knaus Truck Lines, Inc. in 1955. He then worked for a time for Knaus as a consultant and advisor concerning matters involved with its acquisition of

Boyd Truck Lines. Before his sale to Knaus, he sold the England Brothers Truck Line to A. E. Gallagher. Presently, Boyd is president and general manager of Tri-State Motor Transit Company. By reason of his long experience, Boyd was familiar with truck lines throughout the United States.

Boyd's version of the facts are that in May of 1957 he had a conversation with Mr. Knaus who told him he might be interested in selling his truck line. Mr. Knaus owned the biggest part of the capital stock of Knaus Truck Lines, Inc., and of the Transport Equipment Company. Boyd told Mr. Knaus he thought he could find him a buyer, and Mr. Knaus gave him a letter of authorization (which he personally typed) to represent him in an effort to sell his truck line, Plaintiff's Exhibit No. 1 (A):

"George F Boyd.

"This is your authority, to off all the stock in Knaus Truck lines for Sale. to your prospect, or prospects, For the Net Sum of $1,000,000.00 one Million Dollars. I agree to pay %5 Commission to you if you are able to effect a sale to a party suitable to me, I require a minimin, of 30% down, and terms to be negotiated for the balance,

"I agree to make this offer for one week only, as I have other committments, that I cannot hold up longer than that length of time, That would effet the price, I agreed to sell for at this time, which I have discussed with you on the phone,

Knaus Truck Lines Inc.

/s/ Ezra Knaus. pres."

Afterwards, Boyd told Mr. Knaus that he was going to Menlo Park, California, to see Consolidated Freightways and that he should have financial information to take with him to show the present financial condition of the company; also a copy of his operating authorities and routes, "just general information that a prospective purchaser would be interested in seeing." Mr.

Knaus also supplied Boyd with Plaintiff's Exhibit 3, dated June 19, 1957, a letter reciting that enclosures were made of (1) a certified audit of Knaus Truck Lines, Inc. (as of 12/31/56); (2) a certified audit of Transport Equipment Co. (as of 12/31/56); (3) a list of equipment (over-the-road and city); (4) note schedules of both companies; and (5) blueprint of the Kansas City property showing terminal and parking areas. Boyd then called Mr. Kassebaum, vice president of Consolidated, and made an appointment with him. He purchased an airplane ticket, and conferred with Mr. Kassebaum who requested further information to be supplied on one of Consolidated's forms, which Mr. Kassebaum gave to Boyd on June 24 or 25, 1957. Boyd conferred with Mr. Knaus as to Consolidated's requested information. Mr. Knaus told Boyd that he would make the information available to him through Mr. Troupe, his accountant, which was done. Then Mr. Knaus gave Boyd a copy of Plaintiff's Exhibit 1, upon which Mr. Knaus wrote at the bottom: "this agreement is extended 1 week from today till July-5th. and is understood to Include transport Equip Co—on sale June-27 E. K. (signed) Ezra Knaus." This was in response to Boyd's objection that he could not sell a truck line in a week, to which Mr. Knaus replied that he wanted to be assured that Boyd had an interested party before he made any extensions in the agreement. Boyd then placed a call to Mr. Kassebaum and introduced him to Mr. Knaus over the telephone, they talked, and Mr. Knaus said he was convinced that Consolidated was interested, that they would go ahead and give the additional information. Mr. Knaus caused to be prepared, gave to Boyd who passed it on to Consolidated, Plaintiff's Exhibit 6, which is a detailed account of the assets of Knaus Truck Lines and Transport Equipment Company. Listed are the book values (total $452,000) and the actual values (total $1,182,110).

After June of 1957, Boyd made several telephone calls, and in September, 1957, Mr. Kassebaum and Mr. Knaus met at the lat-

ter's office with Boyd present. Mr. Knaus showed Mr. Kassebaum the property and talked to him. Mr. Knaus said that he preferred to sell to an investor and that he was not right sure that he was going to make a deal with Consolidated. Boyd made efforts to secure an investor who might be interested in buying the line, but was unsuccessful. Boyd testified he also contacted an operator-trucker, Mr. Harvey Jones, in Springdale, Arkansas, about a sale of the truck line. Mr. Kassebaum returned in October, 1957, and Boyd had dinner with him and his lawyer. Mr. Knaus later met with Mr. Kassebaum, but requested that Boyd not be present, saying that he would handle the negotiations himself from that time on. Mr. Knaus never at any time said he was not interested in Consolidated as a purchaser, and in December, 1957, he sold to Consolidated. Although he requested it, no commission or compensation was paid to Boyd for what he had done. The Interstate Commerce Commission approved the purchase by Consolidated of the Knaus Truck Line in October, 1961.

Edward B. Watkowski, Jr., testified that the over-the-counter bid and asked prices of Consolidated's shares of stock on January 3, 1958, were 12¾ and 13⅞, according to the quotations of Blyth & Company, Inc., a general brokerage firm.

Lester Earl Kassebaum, Portland, Oregon, was employed by Consolidated. He testified by deposition that sometime between 1956 and 1960 he learned that the Knaus Truck Line might be for sale when he was approached by Boyd. He told Boyd that Consolidated would not pay a finder's fee on the purchase. He would not go into anything but a "stock deal." He did not talk to Mr. Knaus prior to Boyd's contact. He made two trips to Kansas City in connection with the Knaus Truck Line purchase, and he made a final agreement for 60,000 shares of Consolidated stock in exchange for the Knaus Truck Line. Boyd did not tell him that his authority in finding a buyer was limited to one who was not in

the trucking industry at the time. On his first visit to Kansas City he did not have a joint meeting with Boyd and Mr. Knaus. Mr. Knaus first rejected a Consolidated stock offer, but later he agreed to accept 60,000 shares, and the agreement to sell was made about December 15, 1957.

As admissions against interest, portions of Mr. Knaus' deposition were read: He first talked with Boyd about the sale of Knaus Truck Lines in April or May, 1957. In his best judgment, the value of Consolidated's stock in December, 1957, was right around twelve dollars. Boyd first mentioned to him the company of Consolidated Freightways probably in July, 1957, but never mentioned selling direct to Consolidated. Mr. Knaus first talked to Consolidated about a stock exchange in September, 1957. In December, 1957, if Boyd had found an individual (a nonoperator—an "operator" being defined in the instructions as meaning a truck line registered with the Interstate Commerce Commission), he had authority to go ahead and sell the truck line at the price Mr. Knaus had given him. He finally negotiated with Consolidated for 60,000 shares of stock in the last week of December, 1957. Further admissions elicited at trial from Mr. Knaus are: He prepared, typed and signed Plaintiff's Exhibits 1 and 2; there was no other written agreement regarding a commission between him and Boyd except those documents; Boyd brought him a contract for a sale to an operator on or about July 18, 1957; that in December, 1957, he made a deal with Consolidated whereby the Knaus Truck Lines stock was exchanged for Consolidated Stock worth $720,000; Plaintiff's Exhibits 1 and 2 did not contain either the word "operator" or "non-operator"; in September, 1957, he met with Kassebaum, and that he previously testified by deposition that Consolidated wanted information "to see if they would be interested in making any kind of a stock exchange with us"; he again met with Consolidated representatives in October, 1957, and it offered 65,000 shares of its stock for Knaus Truck Lines on October 4; until Mr.

Knaus actually sold the line so far as he knew Boyd probably was still working on the sale; in August, 1957, Knaus Truck Lines' current liabilities exceeded its current assets; and he did not know any Consolidated personnel until he commenced the dealings which resulted in the exchange of stock.

The evidence of Mr. Knaus was that Mr. Harvey Jones of Springdale, Arkansas, was never contacted by Boyd for a sale of Knaus Truck Lines to him. He did not know it was for sale until it had actually been sold. Mr. Margolin, counsel for Mr. Knaus, testified he represented him in his efforts to sell the truck line, the first meeting being in July, 1957, wherein Boyd disclosed his prospect as being a Robert W. Lacey. Boyd did not mention Consolidated at that first meeting or any time thereafter. Margolin asked Boyd if it was entirely clear to him that Mr. Knaus was not interested in making a deal with an "operator," because he would not go through the delays of applying to the I.C.C. for permission. At a second meeting Boyd submitted Defendants' Exhibit 5, a written proposal which he said was from Lacey, which was rejected because it did not provide for a cash transaction and did not contain a representation or warranty that Lacey was a "nonoperator." Margolin drew up a contract, Defendants' Exhibit 6, containing those provisions, and which named Robert W. Lacey as buyer. That contract was not executed by Lacey, and Margolin did not recall any communication from Boyd after he drafted the contract. About October 4, 1957, Margolin met with Mr. Knaus, Kassebaum and attorney Shafer, wherein the Consolidated people expressed a desire to acquire a freight line and gave information about the desirability of a stock exchange. No offer was then made. Margolin's next contact with Consolidated representatives was December 16, 1957, when he called Mr. Shafer. He and Mr. Knaus went to Portland, Oregon, about December 28, 1957, and the deal was closed before the first of the year. The sale was subject to Consolidated procuring a tempo-rary authority from I.C.C., and pending an application for permanent authority from that agency, and that Consolidated would bear interim expenses of operation and indemnify Knaus Truck Lines for any losses in the event permanent authority was denied. Initially, permanent authority was denied by I.C.C., but was finally granted in January, 1961. After that the reorganization agreement (for exchange of stock) was consummated by Consolidated and Mr. Knaus.

Mr. Knaus testified that in April or May, 1957, Boyd contacted him about selling the truck line. Mr. Knaus told him he would sell provided he could sell to a nonoperator for one million dollars. Boyd proffered a contract, Defendants' Exhibit 2, which was rejected by Mr. Knaus, providing that Boyd would sell for one million dollars, at a 5% commission, to a nonoperating purchaser, within 90 days. Later, about June 19 or 20, Boyd came back to see Mr. Knaus and said he had a prospect he thought would buy immediately and he wanted some kind of authorization for the sale. He said his prospect was Robert Lacey. He came back in a week and asked for an extension of time, which Mr. Knaus gave him as per Plaintiff's Exhibit 2. Boyd was not able to complete the deal. About July 5, Boyd presented Defendants' Exhibit 5, which was rejected upon advice of Margolin, and Defendants' Exhibit 6 was given Boyd eight or nine days later. Boyd later informed Mr. Knaus that Lacey was not able to raise the money and the deal fell through. Somewhere along the line Boyd did mention that Lacey was going to try to sell the truck line to Consolidated, but Boyd had no authority to offer Knaus Truck Lines to Consolidated for sale. In a form of contract or any other way, Mr. Knaus did not authorize Boyd to do anything further in connection with a sale of the truck line to anyone after Boyd advised him that Lacey could not raise the money. He would have given him (or anybody) a commission if he would have sold the line for a million dollars to an individual so he would not have to go through an I.C.

C. hearing. "We couldn't pay the commission and the cost of the hearings also." Mr. Knaus granted no extension of Boyd's contract. Boyd did not introduce Kassebaum to Mr. Knaus, who met him in September, 1957, and told him then he was not interested in a stock exchange. On October 4, 1957, Kassebaum and Shafer came to Kansas City and met at the Continental Hotel with Mr. Knaus and Margolin. Boyd was not present. Mr. Knaus arranged to secure equipment appraisals for Consolidated. No definite offer was then made. Consolidated representatives talked in figures of fifty-five, sixty-five and seventy thousand shares. Further information was given Consolidated by Mr. Knaus' auditor who billed Consolidated direct for his services. Knaus Truck Lines began losing money rapidly in the last six months of 1957, about 400 pieces of equipment would have to be licensed at a cost of two hundred to three hundred thousand dollars for the ensuing year, so Mr. Knaus made a trip to Portland, Oregon, and made a contract to exchange all of the shares of Knaus Truck Lines, Inc. and the Transport Equipment Company for 60,000 shares of Consolidated's stock. Mr. Knaus testified further that he never did ask Boyd to contact any truck line in reference to selling his line. "Mr. Boyd plainly understood that I would only sell at that time when I talked to him to an individual, so we didn't have to go through the I.C.C. hearings." When asked in January or February, 1958, by Boyd to pay a commission, Mr. Knaus told him he didn't think he was entitled to it; that he did not sell to an individual, "and we could have sold to a truck line ourselves if we wanted to go through the I.C.C. hearings, but we could not pay a commission and go to all that expense. That is why it is very risky selling to another truck line. If it was turned down, we would have been broke."

 There are several reasons why Boyd was not entitled to a directed verdict upon his claim on the written contract, Count I of his petition. The first is the question of fact whether Boyd actually produced Consolidated as a purchaser. His testimony was that he did so, but the conflict with that position is the testimony of Margolin and Mr. Knaus that Boyd represented to them that his prospective purchaser was a Mr. Lacey. He never did mention Consolidated to them as a prospect. Secondly, there was a question for the jury as to whether Boyd was authorized to secure an "operator" purchaser under the provision in the initial writing between Knaus and him that a purchaser be procured who was suitable to Mr. Knaus. Boyd contends that the words "suitable to me" as used in Plaintiff's Exhibits 1 and 2 are not ambiguous and are therefore not open to construction by the parties. These words are meaningless unless explained. Mr. Knaus' testimony that the words "suitable to me" meant an operator not authorized as a truck line under the I.C.C. was not improper. Taken in connection with other testimony that a sale to an "operator" would entail delay and expense of I.C.C. hearings, the defense that Boyd was authorized only to make a sale to a nonoperator is not invalid as a matter of law. Under the evidence, the issue raised by that defense was also for the jury.

 Boyd's written contract further authorized him to sell for one million dollars and within one week after the contract (Plaintiff's Exhibit 2) was extended (to July 5th). Boyd did not produce a purchaser at any time for one million dollars. The jury could find that he did not produce a purchaser of any kind within the time limited—by July 5, 1957, and that the time of performance was not extended by the acts of Mr. Knaus through December, 1957, as submitted by plaintiff in Instruction No. 2. There does exist a general rule that a broker is entitled to his sale commission where he is the procuring cause of the sale, even though the seller accepts a lesser price from that the broker was authorized to accept. Taussig, Day & Co. v. Poleman, 360 Mo. 470, 228 S.W.2d 722; Martin v. Mercantile Trust Company, Mo., 293 S.W.2d 319, 326; McIntyre v. Emmenegger, Mo.App., 355 S.

W.2d 351, 353. But the right to recover a commission depends upon the broker's contract. Bowman v. Rahmoeller, 331 Mo. 868, 55 S.W.2d 453, 458. Note that the instant contract, prepared and signed by Mr. Knaus, gave to Boyd the authority to sell the line for one million dollars by July 5, 1957, and contained the phrase, "I agree to make this offer for one week only, as I have other committments, that I cannot hold up longer than that length of time, That would effet the price, * * *." This contract, and the evidence in connection therewith, i.e., a sale authorized only to a nonoperator, so as to avoid I.C.C. hearings, is a conditional or contingent one as the jury could determine under the evidence and instructions given. The cases and authority relied upon by Boyd, 12 Am.Jur.2d Brokers, § 183, p. 924; 12 C.J.S. Brokers § 85, p. 187; Isaac T. Cook Co. v. Craddock-Terry Co., Mo.App., 109 S.W.2d 731, are not controlling where the contract may be found to be conditional or contingent. "But, if the broker's contract makes the right to commission conditional on a sale at a fixed price or within a definite time, he is not entitled to a commission for sale made at a less price or after such time." Bowman v. Rahmoeller, 331 Mo. 868, 55 S.W.2d 453, 458 [6, 7], and cases cited. See also Proctor v. Gentry, Mo.App., 214 S.W.2d 746, 747; Rogers v. McCune, Mo.App., 283 S.W.2d 872, 876; White v. Barton, Mo.App., 269 S.W.2d 673, 676; Real Estate Enterprises v. Collins, Mo.App., 256 S.W.2d 286; Taylor v. Vestal, Mo., 304 S.W.2d 820, 823. Boyd had the burden of proof to show that his alleged performance was within his contract. That proof was oral. "In a case where the allegations of the petition are denied by the answer, and the plaintiff offers oral evidence tending to support the allegations of the petition, the defendant is entitled to have the jury pass upon the credibility of such evidence even though he should offer no evidence himself." Cluck v. Abe, 328 Mo. 81, 40 S.W.2d 558, 559 [1–3]; Tonkins v. Monarch Building Materials Corporation, Mo., 347 S.W.2d 152, 157 [5–7].

■ Boyd says that Mr. Knaus has not sufficiently denied his allegations of the petition in his answer. By paragraph 1 of the answer, "Defendant denies each and every allegation contained in Paragraphs 2, 3, 4, 5, 6 and 7 of Count I not specifically admitted herein." Suffice it to say that the answer complied with Civil Rule 55.09, V.A.M.R., in that there are general denials of averments except those "specifically" admitted, which is the same as the rule wording of "designated" averments or paragraphs. The answer puts in issue: whether Boyd procured a sale to a nonoperating purchaser within the time limited who would purchase for one million dollars; and whether Boyd procured Consolidated as a purchaser at all. These were the basic issues for the jury.

■ For the cross-appeal, attacking the $10,000 judgment upon Count II, Mr. Knaus' representatives say first that Boyd is entitled to nothing because the evidence and pleadings conclusively established that any services rendered were under the terms of an express written contract and therefore there could be no implied contract between the parties for payment of services. It is argued that a party cannot have both an express contract and an implied contract arising out of the same circumstances. Cited is 12 Am.Jur. Contracts, § 7, p. 505, "There cannot be an express and an implied contract for the same thing existing at the same time. It is only when parties do not expressly agree that the law interposes and raises a promise. No agreement can be implied where there is an express one existing." Further quotation from that same authority is, "The rule that a promise by implication does not exist where the party had made an express promise is not arbitrary and inflexible." The first-quoted and relied-on authority ignores the long line of Missouri cases well settling the proposition that a plaintiff may treat the express agreement abrogated or rescinded and recover the reasonable value of the services rendered on quantum meruit, and may introduce the contract into evidence upon the question of damages, being limited in recov-

ery to an amount not exceeding the contract price. Illustrative of these cases are Bailey v. Interstate Airmotive, 358 Mo. 1121, 219 S.W.2d 333, 338 [7], 8 A.L.R.2d 710; Grue v. Hensley, 357 Mo. 592, 210 S.W.2d 7, 11, and cases there cited. Later cases announcing the same rule are: Oliver L. Taetz, Inc. v. Groff, 363 Mo. 825, 253 S.W.2d 824, 829 [4, 5]; State ex rel. Intern. Terrazzo & Mosaic Flooring Co. v. Aetna Casualty and Surety Company, Mo.App., 350 S.W.2d 418, 423. And of course under the present-day practice of pleading, regardless of sufficiency or consistency a party may set forth claims to relief alternatively (as was done here in Counts I and II). Civil Rules 55.06 and 55.12, V.A.M.R.

■■■ The answer filed here does not raise any issue that Boyd be required to elect upon which counts of his petition he was going to submit his case. The matter of an election of the remedy is required to be pleaded affirmatively as a defense. Mottley v. Dugan, Mo.App., 191 S.W.2d 979, 983 [14]; State ex rel. Kansas City v. Harris, 357 Mo. 1166, 212 S.W.2d 733, 735 [6]. At least, an appropriate motion to require Boyd to elect at the close of the evidence should have been made so that the matter of what should have been submitted to the jury would have been called to the attention of the court. 25 Am.Jur.2d Election of Remedies, § 34, p. 676. Mr. Knaus' motion for directed verdict did not raise the issue. In other states, there is divided authority as to whether a plaintiff may be required to elect between actions on an express contract and on a quantum meruit. 28 C.J.S. Election of Remedies § 6, p. 1072, and pocket part. In Missouri, however, it seems that these theories of recovery are inconsistent and a party may be required to elect as to which he will submit to the jury. "A party cannot count upon a contract and recover upon a quantum meruit." Missouri Pac. Ry. Co. v. Kansas City & I. Air Line Co., 189 Mo. 538, 88 S.W. 3, 5; Robson v. United Pacific Insurance Company, Mo., 391 S.W.2d 855, 860 [1–3]; O'Neal v. Mavrakos Candy Co., Mo.App., 255 S.W.2d 138, 140 [1] (aff'd 364 Mo. 467, 263 S.W.2d 430); Heard v. Stahl, Mo.App., 271 S.W.2d 68, 70 [2]. These cases, however, limiting recovery to the pleaded theory to the exclusion of any other theory, are applicable on their facts to the situation of where a plaintiff has "chosen his route." Young v. Hall, Mo.App., 280 S.W.2d 679, 681. Krupnick and Associates, Inc. v. Hellmich, Mo., 378 S.W.2d 562, relied upon by cross-appellants, has language that "the express contract which existed between the parties and which was shown by the plaintiff's evidence would preclude recovery on that basis just as the express contract precluded the finding of a contract implied in fact and relied upon by plaintiff in its original petition. Such express contract would also preclude the existence of the contract implied by law or quasi contract, necessary to form the basis for recovery in quantum meruit. (Citing cases)." 378 S.W.2d 569. That case did not have any issue of election as between the theories urged. It was held merely that plaintiff having proceeded on his existing contract (not treated as abrogated or rescinded) could not have a recovery on a quantum meruit, and a remand for a hearing on that theory was denied upon the motion for rehearing. The case, however, is further illustrative of the inconsistencies between the instant two theories.

■■■ The difficulty with appellant's cross-appeal position here is that Mr. Knaus in no way urged in the trial court that Boyd elect between his pleaded theories. He sat by and allowed him to submit both theories to the jury by Instructions Nos. 2, 3 and 5 (the latter upon reasonable compensation upon the implied contract of Count II). The cross-appealing appellants raise no question here as to the sufficiency of Boyd's evidence to support his submission to the jury of his alternative theory of recovery on quantum meruit. Not having called the attention of the trial court to any imperfection of submission of theories to the jury, these appellants must be deemed to have

waived the same. 25 Am.Jur.2d Election of Remedies, §§ 33, 34 and 35, pp. 675 et seq.; "The doctrine of election, whether applied to the selection of optional courses of procedure or the choice of individuals to be sued, is intended for the benefit of the parties charged, and the defense may be waived by them." 28 C.J.S. Election of Remedies § 29, p. 1103. See also 71 C.J.S. Pleading § 563, p. 1131. In this state, as to waiver by failing to move for an election between two or more improperly joined causes of action, see Hartz v. Page, 224 Mo.App. 83, 20 S.W.2d 701, 704, and cases cited (although now under said Civil Rules, two claims to relief may be joined in one count). As to inconsistent defenses, see Feiden v. Gibson, Mo., 218 S.W.2d 105, 107 [6, 7], "Furthermore, we find no motion to strike or to elect in the record before us. A motion to strike or to elect is the proper remedy for inconsistent defenses, and in the absence of such motion, the objection is deemed waived."

▇▇▇▇ The last point is that Boyd's claim to relief on his alleged implied contract under Count II is barred by the five-year statute of limitations, § 516.120(1), RSMo 1959, V.A.M.S. According to Boyd, his performance of services to Mr. Knaus in connection with selling the truck line ended in October, 1957. Mr. Knaus' contract with Consolidated was conditional or contingent upon Interstate Commerce Commission approval of the sale. That approval was had (after an initial denial) in October, 1961. Suit was filed June 30, 1964, within five years of the approval of sale. Mr. Knaus' contract with Consolidated was conditioned upon such I.C.C. approval, and if it were not had the sale was off and the truck line was to be returned to Mr. Knaus. Although the performance by Boyd was more than five years before he filed suit, the statute of limitations has no application under the facts of this case; he was not entitled to a commission until Mr. Knaus received his sale proceeds. See Edwards v. Bethany Hospital, Mo.App., 148 S.W.2d 97, 99 [3], where it was held that the cause of action

for attorney's fees did not accrue until there was a "recovery" by the defendant. See also 54 C.J.S. Limitations of Actions § 133, p. 50, "Where a contract of employment provides that compensation is to be paid on the happening of a certain event or the fulfillment of a certain condition, a cause of action for compensation accrues and the statute of limitations begins to run on the happening of such event or the fulfillment of such condition, but not until that time." See also 54 C.J.S. Limitations of Actions § 134, p. 53; and Lewis v. Thompson, 231 Mo.App. 321, 96 S.W.2d 938, where it was held that the statute of limitations did not begin to run until the future event of the taking of a necessary inventory happened.

The judgment is affirmed.

BARRETT and STOCKARD, CC., concur.

PER CURIAM:

The foregoing opinion by PRITCHARD, C., is adopted as the opinion of the Court.

All of the Judges concur.