Edward H. WADDINGTON,
Plaintiff-Respondent

v.

Charles Z. WICK and Mapleton Enter-
prises, Defendants-Appellants.

No. WD 32487.

Missouri Court of Appeals,
Western District.

March 29, 1983.

Motion for Transfer to Supreme Court
Denied May 31, 1983.
Application to Transfer Denied
June 30, 1983.

Carl H. Helmstetter, Spencer, Fane, Britt & Browne, Kansas City, for defendants-appellants.

Robert M. Modeer, Hoskins, King, McGannon, Hahn & Hurwitz, Kansas City, for plaintiff-respondent.

Before SOMERVILLE, C.J., and WASSERSTROM, TURNAGE, MANFORD, KENNEDY, NUGENT and LOWENSTEIN, JJ.

TURNAGE, Judge.

Edward Waddington brought suit against Charles Wick and Mapleton Enterprises for the reasonable value of his architectural services. After a bench trial, the court entered judgment in favor of Waddington for $39,381.67, which it determined to be the value of the architectural service he had performed. On this appeal, Wick contends that the judgment should be limited to the contract price agreed upon by the parties. Reversed and remanded.

Waddington filed a petition alleging that he had performed architectural services for Wick and Mapleton, a corporation in which Wick was the principal stockholder, for plans and specifications regarding the expansion and rehabilitation of the Holmesdale Convalescent Center. Wick answered and attached a copy of a contract between himself and Waddington. Wick's answer alleged the payment of certain amounts on a contract between himself and Waddington, and alleged defective performance on the part of Waddington. Wick contended that if Waddington were entitled to anything, he was restricted to the contract amount less payments already made by Wick. Wick filed a counter-claim alleging both untimely and defective performance by Waddington.

The court entered findings of fact in which it made no finding concerning the existence of a contract. However, Wick and Waddington agree that they entered into a contract[1] on November 21, 1977, which stated that Wick intended "to erect a new wing and rehabilitate the existing facility totaling 120 beds for FHA Project No. 084–43041–PM–SR, known as Holmesdale Convalescent Center, 8039 Holmes, Kansas City, Missouri."[2] The contract provided that Waddington would provide all architectural, engineering, and consulting services. It further stated: "The owner [Wick] agrees to pay in addition to the contract price, the cost of any supplementary drawings required by reason of construction changes as agreed to by both parties." The contract also provided that Waddington

---

1. The dissent argues that the court could have concluded that the contract in this case was actually a sham, and that the parties did not attach importance to it. However, in both his supplemental brief and in the course of his oral argument, Waddington stated unequivocally that there was a contract.

2. The dissenting opinion makes the mistaken assumption that the contract in this case contains specific details regarding the design and contents of the building. In fact, the contract does not describe the building in any more detail than the language quoted above.

would receive a total fee of $26,640, to be paid in installments of 75% at the completion and acceptance of the working drawings, and the balance to be paid monthly as the work progressed.

There is no dispute that Wick desired to obtain a federally insured loan to rehabilitate the existing convalescent center, as well as add a new wing thereto. This fact was well known to Waddington at the time that the contract of November 21 was entered into. Although the contract made no reference to the estimated cost of construction of the rehabilitation and the new wing, the parties agree that Waddington estimated that the cost would be about $477,000. The fee to be paid to Waddington under the contract made no reference to any estimated or bid cost of the work, but rather was a flat fee.

Waddington began work after signing the November 21 contract, and he completed the detailed plans and specifications on September 17, 1978. At that time, two contractors were invited to estimate the cost of construction. The lowest of these estimates was about $733,000. For several reasons, one of which was the excess of the contractor's estimate over Waddington's estimate, Wick abandoned the project.

Waddington's theory at trial and on this appeal is that Wick did not plan to add 20 private baths to 20 of the existing rooms, or plan for certain other engineering modifications at the time that the November 21 contract was signed. Waddington claims that the plans and specifications completed by him on September 17, 1978, contained both plans for making private baths in those 20 rooms and certain other engineering modifications, and that this constituted work outside the scope of the contract, for which he should be compensated. He also claims that the reasonable fee to which he is entitled is 6% of the contractor's estimate of about $583,000 for the new wing, and 8% of the $150,000 estimate for rehabilitation. Waddington first claimed that he was entitled to payment in excess of the contract price in a bill which he submitted on September 25, 1978, well after he had completed all of the requested plans and specifications.

The trial court found that the architectural services required as a result of the increase in the number of bathrooms by 20 and certain other engineering modifications constituted extra work on the part of Waddington. The court found that the reasonable fee due Waddington was 8% of the estimated cost of the rehabilitation work of $150,000, and 6% of the new construction estimate of $583,000.[3] Giving credit for payments made resulted in the amount of the judgment. As noted, the court made no mention of the contract for architectural services.

There is no doubt that a party may ignore an express agreement and bring suit for the reasonable value of services rendered. In such circumstances, the party is limited in recovery to the contract price. *Boyd v. Margolin,* 421 S.W.2d 761, 767–68[9] (Mo.1967). This rule may be avoided, however, in cases where either the contract has been abandoned,[4] or the tasks performed constitute extra work.

---

3. The trial court's action is undoubtedly derived from the common practice followed in most owner-architect contracts wherein the architect's fee is figured as a percentage of the ultimate construction cost rather than a fixed fee. The advantage of the percentage based fee is that it avoids the kind of dispute involved in this case, which arises when, due to architectural modifications requested by the owner in the designing stage, the final projected construction cost of the project is significantly greater than the initial projection. In this case, the parties presumably chose to contract for a fixed fee rather than a percentage based fee because they believed that this arrangement was in their mutual best interest.

4. This abandonment exception pertains only to the abandonment of an owner-architect contract in favor of the adoption of a different written or implicit agreement over the course of the time that the services in question were being rendered. The dissenting opinion mistakenly confuses the abandonment of a contract with the abandonment of a project. Obviously, the project involved in this case was abandoned, in that building and rehabilitation were never actually begun. However, the abandonment of the project in no way consti-

In order to prove that a contract was abandoned, the abandonment must be demonstrated by positive and unequivocal acts and conduct which are inconsistent with a mutual intention to be further bound by the contract. *Julian v. Kiefer*, 382 S.W.2d 723, 729–30[8–14] (Mo.App.1964). In other words, an intent to abandon a contract is not enough. Rather, this intent must be carried into effect by an external act. *Miran Inv. Co. v. Medical West Bldg. Corp.*, 414 S.W.2d 297, 303[9, 10] (Mo.1967).

There have been no such positive and unequivocal acts demonstrating a mutual intention to abandon the contract in this case. This case arises out of a difference in opinion regarding the scope of the contract between Wick and Waddington. Specifically, the focus of the dispute is whether certain changes and modifications involving the addition of 20 bathrooms and other engineering modifications were within the scope of the contract. Thus, this case involves the construction of a contract, rather than the abandonment of one.

Similarly, the extra work doctrine [5] is inapplicable in this case. Extra work in the context of building contracts refers to work not contemplated by the parties at the time of contracting and entirely independent of what is required in performance of the contract. *Kaiser v. Lyon Metal Products, Inc.*, 461 S.W.2d 893, 898 (Mo.App. 1970). Regardless of which way the factual questions in this case are resolved, Waddington's completed plans and specifications cannot be said to have been entirely independent of what was required in the performance of the contract between Wick and Waddington. The remaining question is whether the work performed by Waddington was contemplated by the parties at the time of contracting.

The extra work doctrine is generally applied to the relationship between a contractor or a subcontractor and an owner, rather than to the relationship between an architect and an owner. Thus in order to determine whether or not the parties contemplated, at the time of contracting, that Waddington was to provide architectural services for the 20 additional bathrooms and other engineering modifications, it is necessary to determine whether the extra work doctrine should be applied to the architect-owner relationship as well.

The crucial focus of this inquiry is whether, in this context, the roles of architects and builder/contractors [6] are distinguishable. An architect is one who makes plans and specifications for designing buildings and other structures, and supervises their construction. *See, e.g., Stephens County v. J.N. McCammon, Inc.*, 122 Tex. 148, 52 S.W.2d 53, 56[5] (Texas 1932); Black's Law Dictionary 97 (5th ed. 1979); 6 C.J.S. *Architects* § 2 (1975). In lay person's terms, a property owner tells an architect basically what kind of structure is desired, and the architect takes it from there, designing the specifications which are later used by engineers and builders.

On the other hand a builder, or contractor, or building contractor, is one who contracts with an owner to build and erect the structure according to the plans developed by the owner and the architect. *See, e.g.,* Black's Law Dictionary 176 (5th ed. 1979) and 17 C.J.S. *Contracts* § 11 (1963).

Thus, a builder does not stand in the same relationship to an owner as does an architect. At the time that an owner and an architect contract, the precise specifications of the structure are necessarily rather amorphous, since creating such plans and

---

tued an abandonment of the contract, since Waddington had contracted merely to provide whatever architectural services were required in connection with the project.

5. A distinction is sometimes made between extra work, additional work, and alterations. Additional work is work necessarily required in the performance of the contract, but the necessity of which arises from unanticipated condi-

tions. Alterations are changes in the form of the work which do not destroy its identity. *See generally* 7 A.L.R. P.O.F.2d 248, n. 32 and accompanying citations.

6. The terms builder and contractor are synonymous. See *State v. Clark,* 43 Wash. 664, 86 P. 1067 (Wash.1906).

specifications is the very service for which the owner contracts with the architect. The relationship between the owner and the builder, however, is much more defined at the time their contract is entered into, since it is based on the plans and specifications developed by the architect.

It follows from the above discussion that the extra work doctrine should not be applied to the relationship between Wick and Waddington. Thus, since neither this exception nor the abandonment exception is applicable, this case is governed by the general rule that in suing for the reasonable value of services rendered, a party's recovery is limited to the contract price. This conclusion can be verified by examining the case law regarding the scope of an architect's contractual duties arising out of an owner-architect contract.

There are few cases which address this precise issue, and none of these are Missouri cases. Two cases in this category, however, are remarkably similar on their facts to this case. The most recent of these cases is *Ingram v. State Property and Buildings Commission,* 309 S.W.2d 169 (Ky.1957), which involves an architect's suit against a property owner seeking compensation for services in excess of a fixed contract price.

In *Ingram,* the contract provides for the building of "A Student Union Building," without further details. The Wick-Waddington contract is similarly vague, calling for the building of "a new wing and rehabilitat[ing] the existing facility totaling 120 beds for FHA Project No. 084–43041–PM–SR, known as Homesdale Convalescent Center, 8034 Holmes, Kansas City, Missouri." Both contracts fail to provide further plans and specifications regarding the building to be built, which is understandable, since this is the very service which the architects were contracted to perform.

In light of the lack of detail in describing the building, the *Ingram* court concluded that the architects had implicitly bound themselves to design a building which would ultimately meet with the approval of the owner. 309 S.W.2d at 171. The court used this implicit assumption in reaching its

holding that labor alleged to be extra work by an architect was actually within the scope of the express contract. *Id.* at 173.

The contracts in both the *Ingram* case and this case also contain a provision wherein the architect agreed to provide all architectural, engineering, and consulting services. The two contracts differ in that only the *Ingram* contract contains language stating that the architect agreed to make such changes and additions as the owner might request from time to time. *Id.* at 171.

This distinction is not a crucial one, however. The language in *Ingram* indicates that the court's conclusion that the architect bound himself to plan a building which would ultimately meet with the owner's approval was drawn from the general nature of the discription of the building, and not from the changes and additions clause. Thus, applying the *Ingram* case here would result in an inference being drawn that Waddington implicitly contracted to satisfy Wick, in spite of the absence of a changes and additions clause.

Another distinction between *Ingram* and this case is that the *Ingram* contract contains the following clause.

... the Architect's fee is not subject to adjustment by reason of any higher bids received for the construction of the project or by reason of any change or addition within the scope of the contract. *Id.* at 170–71 (Court's emphasis)

The following seemingly inconsistent statement is contained in the Waddington-Wick contract:

12. The Owner agrees to pay, in addition to the contract price, the cost of any supplementary drawings *required by reason of construction changes* (emphasis added).

The apparent inconsistency between these clauses is that the *Ingram* contract seems to say that additional compensation *may not* be received by the architect for extra, uncontemplated work, while the Waddington-Wick contract seems to say that additional

compensation *may* be collected for such work.

■ On a closer examination, however, it is clear that these clauses are not contradictory, and thus do not constitute a basis for distinguishing this case from *Ingram.* The *Ingram* court interprets the above clause as simply fixing an absolute maximum fee that the architect could receive for all work done within the scope of the contract. 309 S.W.2d at 172. Similarly, the contract in this case sets forth a maximum fee receivable for performance of the contract. The above clause from the Waddington-Wick contract, both on its face and as interpreted by Waddington himself, relates only to supplemental drawings required by and during the course of construction. It does not apply to changes requested by the owner before construction is begun. Since construction was never begun in this case, the above quoted provision was never triggered, and the additional drawings requested by Wick were not required by "construction changes." Thus, these additional drawings were within the scope of the contract, and not a cause for awarding Waddington an additional fee above the contract price.

The other case which closely resembles this case is *Osterling v. First Nat'l. Bank of Allegheny,* 262 Pa. 448, 105 A. 633 (Pa. 1918). The relevant portion of the *Osterling* contract states:

> I propose and agree to furnish the plans, specifications, and detailed drawings necessary to erect your building, including supervision of the work, preparing of contracts, and the usual and customary services of an architect, for a commission of 5 per cent upon the cost of the work . . . *Id.* at 633.

This contract, like the *Ingram* and Waddington-Wick contracts and like owner-architect contracts in general, describes the structure to be built only in very general terms.

While the 5 per cent commission on the total cost of the building in *Osterling* was paid without question, the architect sued, among other reasons,[7] to recover an additional fee for preparing revised drawings. These revised drawings were done at the request of the owner, in light of changes that were made in the details of the structure as work proceeded. The court refused to award Osterling a fee in excess of the agreed contract rate, stating:

> . . . Osterling "proposed and agreed to furnish all necessary plans and specifications to erect the building." This contemplated *not only the plans which he* had already prepared, but included any and "all" plans which in the process of erection might be called for. *As an architect he was doubtless familiar with the fact that most owners in the course of building make changes in both plans and specifications, and he is fairly to be presumed to have contemplated just that* . . . *Id.* at 634 (emphasis supplied.)

The provision in the Waddington contract that "[t]he architect agrees to provide all architectural, engineering, and consulting services" is, in practical terms, identical to the first part of the above quote.

■ Apparently, the owner's requests for additional drawings in *Osterling* were made both before and during construction, while Wick's requests were made only before construction began. However, this factor does not preclude an application of the *Osterling* holding here. The crux of both the *Osterling* case and this case is that when an architect contracts with an owner to provide full architectural services for the construction of a given building, it is implicit that during the course of the project, the owner may make changes in plans or specifications for the building, thus causing the architect to prepare additional and revised drawings to be included within the contractual fee. It follows that Wick's post-contractual request that Waddington revise the drawings and specifications to add 20 bath-

---

7. The other three grounds offered in support of the architect's claims for an additional fee were for his services as an arbitrator under a clause in the contract, payment for the value of material from the old building used in the new building, and a claim for payment to compensate for a construction delay. 105 A. at 633.

rooms and incorporate other engineering and construction revisions were precisely the sort of changes that should be held to be within the scope of any such owner-architect contract.[8]

In conclusion, this case is governed by the general rule that in seeking recovery for the reasonable value of service rendered, Waddington is limited to the contract price. Since the trial court ignored the contract, it erroneously applied the law. Under *Murphy v. Carron*, 536 S.W.2d 30, 32[1] (Mo. banc 1976), the judgment must be reversed. The judgment in favor of Waddington is reversed, and this cause is remanded with directions to enter judgment in favor of Waddington for the contract price less payments, which is the sum of $12,370.76.

SOMERVILLE, C.J., and MANFORD, KENNEDY and LOWENSTEIN, JJ. concur.

WASSERSTROM, J., dissents and joins in separate dissenting opinion of NUGENT, J.

NUGENT, J., dissents in separate opinion filed.

NUGENT, Judge, dissenting.

I cannot agree with the majority opinion because it is unfaithful to the trial record and it violates the principles established in *Murphy v. Carron*, 536 S.W.2d 30 (Mo.1976) (en banc). We must sustain the trial court's decision unless that court's findings of facts are not supported by the evidence or unless the applicable law has been either erroneously declared or applied.

The trial court made no statement of the law being applied, but as evidenced by its award to the plaintiff, the court apparently acted either on the basis that an architect can be compensated for extra work performed but not contemplated by the parties at the time of contracting, or on the basis

that an architect can be compensated for the reasonable value of his services when a contract has been abandoned.

That being so, under the rule of *Murphy v. Carron, supra,* the court's decision can be reversed only if neither of these conclusions is supported by the evidence. The question is strictly a fact question: does a comparison of the contract with the evidence presented support a finding either that, at the owner's later request, the architect performed certain work not contemplated in the contract or that the contract was abandoned? The record shows the following:

### I. *The Record*

Plaintiff Edward Waddington is a Kansas City architect. Defendant Charles Wick is a law school graduate and an experienced nursing home builder, owner and operator. The two had on a number of occasions before 1977 worked together on the defendant's nursing home projects. So far as the record shows, those earlier projects had been without formal contracts, and Mr. Wick appears to have been satisfied with the architect's services and percentage-based fees.

Talks between Mr. Waddington and Mr. Wick about rehabilitation and expansion of the defendant's nursing home in this case began in 1975. They corresponded about and discussed details of the design and construction of additional bedrooms and bedrooms designed to accommodate three beds. In early 1977 the discussions became more serious. The object was to make the facility more competitive. Mr. Wick directed the architect to prepare the necessary work for the feasibility phase of an FHA–HUD mortgage insurance application.

Obtaining FHA-insured mortgage financing involved a three-stage process. The first stage was a proposal to FHA in early 1977 and a request for a feasibility study. The federal agency indicated its tentative

---

8. The dissent relies on *Fitzgerald v. Walsh,* 107 Wis. 92, 82 N.W. 717 (1900). In that case, the architect contracted to draw plans for a building. He drew the plans, and they were accepted by the owner. The owner subsequently ordered a second set of plans for an entirely different structure, which the architect prepared. The architect sued in quantum meruit for drawing the second set of plans. These facts readily distinguish that case from the case at bar, since Waddington only prepared one set of plans for one structure.

approval of the project by its October 25, 1977, feasibility letter to Mr. Wick inviting him to submit an application for a conditional commitment, the beginning of the second stage.

FHA's Form 2013, "Application—Project Mortgage Insurance", provides for inclusion of an estimate of the architect's fees. According to the mortgage banker Craig Bennett who handled those transactions, called as defendant's witness, the supporting material which FHA wanted at this stage was the site plans, floor plans and elevations together with outline specifications. Only after issuance of the FHA conditional commitment does the architect prepare the detailed drawings and specifications (in this case a 140-page bound, printed volume).

With the issuance of FHA's conditional commitment the final stage begins. In it the agency indicates that, if the borrower within a specified time prepares his final plans for the project, obtains bids from qualified contractors for completion of the work outlined in the application and finds a lender willing to lend the principal amount on acceptable terms (which will include the liquidation of any existing indebtedness on earlier financing), then FHA–HUD will insure the project loan. Therefore, upon receipt of the conditional commitment the owner must complete his plans for the project and obtain from the architect the final detailed plans and specifications to submit to prospective contractors for bids. Before the architect can complete his design work (the plans and specifications), he must know exactly what the owner wants in his building (assuming he does not have carte blanche from the owner to design the building any way he sees fit). Final approval of the entire package must then be obtained from FHA before the lender will make his first payout.

After receipt of the invitation letter in this case, the mortgage banker obtained from the owner and the architect the supporting data and documents and submitted the application (FHA Form 2013) and supporting material to the agency on November 22, 1977. Among the documents was the November 21, 1977, contract between owner and architect on FHA Form 2719–A required by FHA. The contract stipulated a fixed architect's fee of $26,640, 75% ($19,980) payable upon completion of the plans and specifications, the balance of $6,660 to be paid for the architect's supervisory services during construction. These figures are precisely reflected in the application, which indicates that they total 6% of the plaintiff's estimated cost ($477,090) of the improvements. Defendant's witness Craig Bennett testified that normally an architect's fee is a percentage of cost and expands with the expansion of the project. He also noted that the costs included in the November application were only "projected", that is, "estimated" costs.

At trial, defendant Wick testified that he had signed the November 21, 1977, FHA form contract upon the basis of his understanding that HUD had a contract form incorporating certain mandatory conditions. Before that he had no discussions with Mr. Waddington regarding the fee, and they had no agreement as to the fee. He said that the architect was just to put into effect their earlier discussions about expanding the facility and to do whatever drawings were necessary for FHA processing to get the conditional commitment. Defendant admitted that on November 22 Mr. Waddington "had done whatever an architect is supposed to do in assisting an owner in bringing a project up to the point where an application for a commitment by FHA is sought." He also testified that he had paid $7,609.24 to or for Mr. Waddington in connection with the project until "May or July, 1978." At that time, he said, it became "foolhardy to pay those bills, particularly in the face of the November 21, '77 contract, *which I didn't pay much attention to.*" Mr. Wick in his testimony did not dispute the fact that he and Mr. Forman, his consultant, had greatly expanded the scope of the project after the signing of the contract. No other evidence was introduced to indicate the contrary.

The conditional commitment was received from HUD on February 7, 1978.

As of November, 1977 the plan had been to expand the facility by twenty bedrooms and six bathrooms. Six months after the FHA form contract was signed, on May 19, 1978, defendant increased the number of private bathrooms from six to twenty. These additions aggravated the ventilation and exhaust problem requiring revisions of the pertinent plans and specifications. Defendant's consultant suggested that the system in place was already inadequate for the existing toilet facilities.

The nature and scope of the project increased "very substantially" after the February 7 conditional commitment. One of Mr. Waddington's associates, Mr. Sneller, had completed the engineering plans by July 12, 1978. After that defendant's construction consultant, Emil Forman, came to town and toured the facility with Mr. Sneller. At that late date, eight and one-half months after the signing, Mr. Forman said that it was an opportune time to make corrections, improve the entire structure, and upgrade the project—to spend money on the existing facility because they could get that as part of their loan. As a result of the meeting, the scope of *the work was revised* to include an updating of the office and lobby area; an addition of sound systems, speakers and microphones; lighting changes; and electrical devices for possible expansion-conversion of two-bed rooms to three-bed rooms. Mr. Sneller did not complete the additional engineering work until August or early September.

Plaintiff completed the plans and specifications on September 17, 1978. The lowest construction estimate Mr. Wick could get was $733,000. Plaintiff testified that the increase in the number of bathrooms and other mechanical changes ordered by defendant in 1978 caused the increase in cost, that the twenty additional baths added an "astronomic expense" and the construction problems were "monumental".

Defendant's witness, mortgage banker Craig Bennett, testified that for such a substantial increase, "you probably put something into the project, some amenities or some design criteria that obviously or supposedly was *not previously contemplated* at the conditional commitment stage." Mr. Bennett further testified that after the bids came in at the greatly increased amount, an attempt was made by defendant to reduce the project and get it back within budget, but by then the financial situation was so bad because of higher interest rates that the project became infeasible and defendant abandoned it.

## II. Architects' Recovery for Extra Work

The majority opinion cites *Boyd v. Margolin,* 421 S.W.2d 761 (Mo.1967), for the general rule that when a plaintiff chooses to base his claim on quantum meruit, his recovery is limited to the contract price. Missouri recognizes the exception to that general rule which allows quantum meruit recovery for those who are required to perform extra work not contemplated at the time of contracting and unhesitatingly applies it to contractors and builders.[1] The majority opinion concludes, however, that an *architect* cannot recover in quantum meruit because of the distinction it finds between architects and builders.

The distinction is irrelevant and in this context nonexistent. Of course, the work which they do differs. Also an architect's services are often more difficult to describe and define than are a builder's, simply be-

---

1. *See Bodde v. Burnham,* 588 S.W.2d 516 (Mo. App.1979); *Kaiser v. Lyon Metal Products, Inc.,* 461 S.W.2d 893 (Mo.App.1970). The latter case is cited in the majority opinion for the proposition that extra work in the context of building contracts refers to work not contemplated by the parties at the time of the contracting and *entirely independent* of what is required in the performance of the contract. The court then says that Waddington's completed plans and specifications cannot be said to be *entirely independent* of what was re-

quired in the performance of the contract. This use of the *Kaiser* case is misleading because *Kaiser* did not say simply that "extra work is work *entirely independent* of the contract", but added an explanatory clause defining "entirely independent", as "something not required" in the performance of the contract. No one can dispute that the work required of Waddington by Wick in 1978 was not required in the performance of the 1977 contract. It was therefore "entirely independent" of the contract, and the majority opinion is incorrect.

cause an architect is involved in planning and a builder is involved in the execution of those plans. To conclude, however, that an architect must therefore be subject to the whims of an owner who may make whatever changes he wishes, as many times as please him, without paying for them or the extra work and expenditures they entail is contrary to both law and business practice, not to mention common sense. Such a conclusion assumes that intelligent architects will blindly contract for a fixed fee to prepare plans and specifications for an owner no matter what changes the owner may order or how much additional work and expense may be added. Of course, no architect in his right mind would ever knowingly enter into such an open-ended arrangement. That has never been the law of Missouri, and its application cannot be justified here on the basis of some notion of a difference between architects and builders *as parties to an employment contract.*

Common sense analysis of this question tells us that cases will differ, but two not uncommon situations come to mind: *First case*—owner (*O*) wants architect (*A*) to design a modern house for *O* and his wife. *O*, a busy, nouveau riche entrepreneur, leaves it to *A* to design an avant-garde showpiece, relying entirely upon *A*'s knowledge, judgment and creativity. *Second case*—*O*'s new wife, after living a time in the new house, decides that she wants a house of conventional design more suitable to the *O*s' lifestyle. She confers at length and in minute detail with *A* about the number, size, shape, and decoration of the rooms, about the kinds and placement of the windows and doors, about the garage, the basement, the kitchen, the entrance hallway, the fireplaces and chimneys, the heating and cooling systems as well as the exterior design, color, materials, roofing, and landscaping. She thinks that she knows exactly what she wants for her new house.

In the first case, if *A* agrees to design and supervise the erection of *O*'s new house, *A* should be held to have anticipated all that would be required to construct the house and not be allowed to charge *O* for "extras" which *A* did not think of in drawing the plans. But in the second case, if, after completion to her satisfaction of the design of the house she had in mind and directed *A* to plan, Mrs. *O* exercises her traditional prerogative and changes her mind and calls for the addition of a dressing room or an upstairs laundry room, which requires a considerable revision of the plans and specifications, *O* should be held to pay for the "extras".

Here we have a *third case—O*, an experienced nursing home owner and operator (who has a number of such properties in his portfolios and who is well-versed in the law, the design and erection of nursing homes, and in the rather esoteric problems of insuring mortgage financing through FHA–HUD), engages *A,* with whom he has worked on several earlier projects, to prepare plans and specifications to update and expand one of his older facilities. *O* confers at length and in detail with *A,* about the shortcomings of the old facility and *O*'s needs and expansion plans for it. The parallel between the second and third cases is obvious.

Because the question whether an architect may be compensated for extra work not in contemplation at the time of contracting is one of first impression in Missouri and we, therefore, look to the cases in other jurisdictions for guidance, we should consider in addition to the Kentucky view discussed at length in the majority opinion, the Wisconsin view as it appeared in *Fitzgerald v. Walsh,* 107 Wis. 92, 82 N.W. 717 (Wis.1900). There the Wisconsin Supreme Court held that when a contract between an owner and an architect calls for "plans and specifications" for a proposed building "the only reasonable, sensible construction of that language is that it called for one set of acceptable plans and specifications. That being satisfied, the acceptance of an order for another set was neither within, nor a mere extra, incidental to, the original contract." When there is no "meeting of the minds" on the subject, "an implied promise arises to pay for the extra or independent work." Such a rule is more equitable than that espoused by the Kentucky court and

the majority opinion, and should be the rule adopted in Missouri.

As the *Fitzgerald* case suggests, the burden should be upon the owner. He is the party seeking to make demands on the architect, and accordingly, the risk should fall primarily on him to state with reasonable particularity at the time of contracting all that he expects of the architect. Unquestionably, an architect's role includes re-working plans, that is, the gross design of the building, until the owner is satisfied, leaving to later the minutiae of architectural and engineering detail. An owner who requests plans for a nursing care facility of a certain number of rooms and with specified amenities is certainly acting reasonably if he rejects the architect's first or second or fifteenth effort to design to his satisfaction the building he ordered. This is the type of "extra work" which an architect must expect to do and should reasonably foresee and contemplate when he enters contracts. However, if after plans have been prepared the owner decides that he wishes to revise the gross design of what he ordered by changing or adding to those elements which he ordered included in his building, the architect is entitled to compensation for the "extra work" of preparing the additional plans and specifications thus entailed. The owner must bear the burden of his second thoughts. (Of course, if the item in question is not one which an owner but an architect should be thinking of in the beginning before the fee is agreed upon, the burden should fall on the architect.) Therefore, if the trial court here based its decision on the legal conclusion that an architect may be compensated for extra work, we may not find that it erred if the evidence is there.

The evidence summarized here provides substantial support for a finding that the architect was required to do extra work not in contemplation at the time of contracting. In his testimony defendant Wick did not dispute the fact that he and his consultant greatly expanded the scope of the project after the signing of the contract. That alone is adequate reason to affirm the trial court's decision.

### III.   *The Abandonment Issue*

The court may also have based its decision on the legal conclusion that the architect was entitled to compensation for the reasonable value of his services because the contract had been abandoned. The majority opinion concludes that the abandonment rule is inapplicable here because of the absence of a "positive and unequivocal" act of abandonment. Such an act need not, however, be an express and open disavowal of a contract, but can simply be behavior inconsistent with the continued existence of a contract.

In *Bogert Const. Co. v. Lakebrink,* 404 S.W.2d 779 (Mo.App.1966), the court found evidence of abandonment where changes had been made in plans and specifications without adhering to the contractual provisions governing such changes and where certain payments were made which were not required by the contract. This is consistent with *Baerveldt & Honig Const. Co. v. Dye Candy Co.,* 212 S.W.2d 65 (Mo.1948), which found an abandonment of the original contract in such changes as the enlarging of the office space, the enlarging of the elevator opening, the changing of the toilet construction and the changing of materials. The court held that it would be "unjust for defendant to have advantage of all these changes" while restricting plaintiff to his original contract price. To the court in *Baerveldt,* it was a matter of the changes being of such scope that the finished building was materially different from the one "vaguely provided for" in the original contract.

Finally, language in *Oliver L. Taetz, Inc. v. Groff,* 363 Mo. 825, 253 S.W.2d 824 (Mo. 1953), suggests that abandonment may be found when the changes in a construction contract greatly prejudice the plaintiff operating under a fixed price contract. In *Taetz,* the court held at 828 that the express contract between the parties had not been abandoned, even though the additions to the building during construction increased the cost "tremendously" because the builder "was not prejudiced by the changes; in fact, his percentage of the profit was increased because of the changes made in the

plans." The opinion leaves the implication that where a builder *is* prejudiced by changes, a finding of abandonment may be appropriate.

Applying the lessons of *Bogert Const. Co., Baerveldt* and *Taetz* to the facts of this case readily leads to the conclusion that the parties abandoned the contract if they ever paid any attention to it at all. The changes made in the project design were described as "monumental" without contradiction or contest. Defendant's own witness said that such a substantial increase in cost of construction—$477,090 to $733,000—required putting something in which had not previously been contemplated. Mr. Wick's testimony supports the inference that the FHA form contract had little import to him until he began to panic about the costs.

Moreover, ample evidence supports the conclusion, plaintiff's counsel's concession notwithstanding, that the signing on November 21, 1977, of the FHA form contract was a sham or at most an obeisance to a bureaucratic requirement, a mere bagatelle to be disregarded and abandoned as soon as the preliminary commitment was issued. The evidence was that normally an architect's fee is a percentage of the construction costs, increasing with any expansion of the project. The written contract was a last-minute departure, an unnegotiated, unbargained for, uncontemplated and irrelevant gesture, coming as it did after months of concentration and work on the project by two persons who earlier had operated on an altogether different understanding. Thus defendant's acknowledged indifference to the form contract makes sense.

Defendant's testimony clearly demonstrates that after the deal became unprofitable for defendant he decided to fall back on the FHA form contract, even though until that time he admittedly "didn't pay much attention" to it. Defendant's own behavior and admissions support the conclusion that the parties acted inconsistently with the existence of a contract and, therefore, either from the beginning never intended to be bound by it or abandoned it later.

Moreover, we may not ignore the fact that Mr. Wick's testimony at some points was in sharp contrast to that of most of the witnesses, even some he called. The trial court's assessment of his credibility is binding on us.

## IV. *The Damages*

As to the trial court's calculation of the amount to be awarded plaintiff under a quantum meruit theory, defendant mistakenly contends that the trial court's use of an eight percent of construction costs factor was baseless. Not only did the court hear testimony from plaintiff that the range of an architect's fee is normally from eight to twelve percent of construction costs,[2] but defendant's own witness, experienced architect Robert Newell, testified that for a project in the range of $440,000, fees could range from three to nine percent.

Accordingly, the trial court has neither misstated the law nor based its conclusions on facts not supported by the evidence. Under the dictates of *Murphy v. Carron, supra,* we should affirm the trial court's decision.

---

**2.** At trial defendant also admitted that he knew that on rehabilitation work architects' fees ran from 8% to 10%.